FILED

03/23/2017

Clerk of the
Appellate Courts



IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 4, 2017

## IN RE:  HAILEY O., ET AL.[1]

**Appeal from the Juvenile Court for Knox County**
**No. 157161   Timothy E. Irwin, Judge**

_____

### No. E2016-01657-COA-R3-PT

_____

The father of two children appeals the termination of his parental rights on the grounds of abandonment by failure to visit them within the four month period preceding his incarceration and by engaging in conduct prior to his incarceration that exhibits a wanton disregard for the welfare of the children.  Finding no error, we affirm the judgment in all respects.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed

RICHARD H. DINKINS, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Anna Renee East Corcoran, Knoxville, Tennessee, for the appellant, Derrick E.T.

Herbert H. Slatery, III, Attorney General and Reporter; Rachel E. Buckley, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

This is an appeal from the order terminating the parental rights of Derrick E. T. ("Father") to his children Hailey O., born in 2008, and Holly T., born in 2010.  The petition to terminate Father's rights was initiated by the Department of Children's Services ("DCS"), which had received custody of the children as a result of a petition it filed to have them declared dependent and neglected.  At the time the children came into DCS custody on October 8, 2015, both of their parents were incarcerated, and they were living with their maternal grandmother and her boyfriend.  In due course the children were determined to be dependent and neglected; the order of adjudication states:

_____

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

[T]he children [Hailey] and [Holly] are dependent and neglected within the meaning of the law due to the parents' inability to provide appropriate care and supervision because of their incarcerations, and due to their failure to provide for an appropriate caretaker for the children while they were incarcerated. The person selected to care for the children, maternal grandmother, . . . failed to provide for the children's medical, dental and educational needs while she was providing for the children, and the children suffered medically, dentally, and educationally because of her failures.

The children were placed in foster care, where they have remained.[2]

DCS filed the petition to terminate Father's parental rights on February 24, 2016, asserting as grounds that, prior to his incarceration, Father engaged in conduct exhibiting a wanton disregard for the welfare of the children and that he had abandoned the children by failing to visit them in the four months immediately preceding his incarceration.[3] Trial was held on July 14, 2016; Father was incarcerated and participated by phone while his counsel participated in person. On July 21, 2016, the court entered an order terminating the Father's rights to both children on the grounds asserted in the petition.

Father appeals, stating the following issues:

1. Whether the evidence presented at trial supports a finding by clear and convincing evidence that the Appellant, prior to incarceration, engaged in conduct which exhibits a wanton disregard for the welfare of the children.

2. Whether the evidence presented at trial supports a finding by clear and convincing evidence that the Appellant has abandoned the children in that he has willfully failed to visit for four (4) consecutive months immediately prior to incarceration.

3. Whether the evidence presented at trial supports a finding by clear and convincing evidence that termination of the Appellant's parental rights is in the best interest of the children.

---

[2] The order of adjudication states the following with respect to the children's foster care placement:

The current placement of the children in a DCS foster home is safe and appropriate and in the children's best interest. The children are doing well in school and in the foster home; Holly has significant dental needs that are being addressed; TNCare appeals have been initiated to obtain coverage for the necessary procedures; both children have therapy monthly; Hailey is behind in school, but making progress academically.

[3] The parental rights of Mother were addressed in a separate proceeding and are not a part of this appeal.

2

# I. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Services v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 766–69. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, "as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements" necessary to terminate parental rights. *Id.*

# II. ANALYSIS

Tennessee Code Annotated section 36-1-113(g)(1) provides that abandonment, as defined at section 36-1-102(1)(A), constitutes a ground for termination; subsection (iv) of the latter statute sets out definitions of abandonment which apply when the parent whose rights are sought to be terminated is incarcerated when the proceeding is instituted. Pertinent to this case, the ground applies where the parent is alleged to have failed to visit the child in the four months immediately prior to incarceration or to have "engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." We shall discuss each ground separately.

3

A. ABANDONMENT BY WILLFUL FAILURE TO VISIT

In the order terminating Father's rights, the court held:

> The Court further finds that Respondent has abandoned these children in that Respondent has willfully failed to visit for four (4) consecutive months immediately prior to incarceration. Respondent has been confined continuously since August 9, 2014. He had been released from jail to probation on January 27, 2014. During that period of slightly more than six months, he did not visit his children. He admitted that he had not seen his children since 2011 when he visited them in the care of their grandmother and when she brought them to his mother's home. He claimed that during the periods of time when he was not in jail he could not locate them. The Court does not find his testimony to be credible.

The court determined, and Father does not dispute, that from April 10 to August 9, 2014, he was not incarcerated, and that period is the applicable period relative to this ground; neither does Father dispute that he did not visit the children during that period. He asserts that his failure to visit was not willful because, after being released from jail in January of 2014, he could not locate his children.

In *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005), the court discussed willfulness in the context of termination cases:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months. . . .
>
> In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

182 S.W.3d at 863–64 (citations omitted).

4

When asked about his failure to visit, Father testified:

Q. So you tried to call the grandmother to find out where they were?
A. Yes
Q. What did you find out?
A. I found out they had been gone [from their grandmother's house] for a while. And the great grandmother, she was extremely upset, so was I, said she couldn't find them, that I needed to talk to a lawyer. I looked on Facebook for accounts, on My Space, I looked - - I called a lawyer. They informed me that I needed to hire a private investigator to find them. I called a private investigator. They were extremely expensive. I didn't have the money for them right then. I just lost hope.

As noted in the holding, the court did not find Father's explanation credible.

Incarcerated parents are permitted to participate by telephone in proceedings to terminate their parental rights in accordance with Tennessee Code Annotated section 36-1-113(f)(3). Notwithstanding the fact that the parent is not appearing in person, we give the same deference to the trial court's credibility determination as that we give with respect to witnesses testifying in person. *See Kelly v. Kelly*, 445 S.W.3d. 685, 695 (Tenn. 2014) ("… a trial court is better situated to gauge the credibility of a telephonic witness than an appellate court."). Therefore, we give great deference to the court's determinations on matters of witness credibility. *Frazier v. Frazier*, No. W2007-00039-COA-R3-CV, 2007 WL 2416098, *2 (Tenn. Ct. App. Aug. 27, 2007) (citing *Wells v. Tenn. Bd. of Regents,* 9 S.W.3d 779, 783 (Tenn.1999). "Accordingly, we will not reevaluate a trial judge's credibility determinations unless they are contradicted by clear and convincing evidence." *Id*.

Father has not cited to clear and convincing evidence which leads us to conclude that the court's determination of Father's credibility was erroneous.

Father was last incarcerated on August 10, 2014; therefore the four months at issue in this case are April 10, 2014 to August 9, 2014. Father testified that the last time he saw Hailey and Holly was in 2011 and that "as soon as I got on my feet, I was supposed to take them back." Father testified that his last period of freedom prior to August 10, 2014, began on January 27 of that year, when he was released to probation. Father acknowledged that, in the years since the births of both children, he was in and out of jail on charges related to what he characterized as his "drug problem." Father stated that by the time he had "accumulated any amount of money" the children had "disappeared off the face of the earth." As previously noted in this opinion, Father testified about his attempts to locate the children, which the trial court discredited.

5

Viewing all the testimony as a whole, the evidence supports the determination that Father's failure to visit was willful and constituted abandonment within the meaning of Tennessee Code Annotated sections 36-1-113(g)(1) and 36-1-102(1)(A)(iv).

B.  WANTON DISREGARD

As noted above, Tennessee Code Annotated section 36-1-102(1)(A)(iv) provides that abandonment may also be found where the incarcerated parent has engaged in conduct prior to incarceration that exhibits a wanton disregard for the well-being of the child or children at issue.  This ground of wanton disregard need not be based on conduct during a particular time period and "reflects the common-sense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866.  "A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child."  *Id.*[4]

Testimony at trial included proof of Father's criminal record which began in 2003 and continued through the time of trial.  The criminal record is reiterated at length in the trial court's findings; Father does not dispute the dates of incarceration or the offenses for which he was convicted.  Those offenses included theft, attempting to manufacture methamphetamine, auto burglary, probation violation, burglary, vandalism, domestic violence, and possession of drug paraphernalia.  Father testified that the longest time he spent out of jail was June 2013 to August 2014.  The record shows that between 2003 and 2014 Father was in and out of jail nine times, representing a clear pattern of criminal behavior.  In 2013, Father was released on the condition that he complete a substance abuse program; he failed to comply with that condition.  The evidence is clear and convincing that Father engaged in conduct demonstrating a wanton disregard for the welfare of his children.

C. BEST INTEREST

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is in the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard.

---

[4] Incarceration alone, however, is not a ground for termination of parental rights:

> Rather, the parent's incarceration serves as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a substantial risk to the welfare of the child.

*In re Audrey S.*, 182 S.W.3d at 866.

*In re Valentine*, 79 S.W.3d at 546. The legislature has set out a list of factors at Tennessee Code Annotated section 36-1-113(i) for the courts to follow in determining the child's best interest.[5] The list of factors in the statute "is not exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interest." *In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dep't. of Children's Servs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)). As we consider this issue we are also mindful of the following instruction in *White v. Moody*:

> [A]scertaining a child's best interests in a termination proceeding is a fact-intensive inquiry requiring the courts to weigh the evidence regarding the statutory factors, as well as any other relevant factors, to determine whether irrevocably severing the relationship between the parent and the child is in the child's best interests. The child's best interests must be viewed from the child's, rather than the parent's, perspective.

171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004) (internal citations and footnote omitted).

---

[5] The factors at Tenn. Code Ann. § 36-1-113(i) are:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

In the order terminating Father's rights, the court made the following findings in holding that termination of Father's rights was in the children's best interest:

1. Respondent has not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the children's best interest to be in his home despite reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible. Respondent does not have a home, he is incarcerated. He may have engaged in treatment, again, during this period of imprisonment but there is no evidence as to how he will behave once he gets out. Respondent has not maintained regular visitation or other contact with the children and no meaningful relationship has otherwise been established between Respondent and the children. He did not visit when he had a chance. His children thought he was dead. A change of caretakers and physical environment is likely to have a detrimental effect on the children's emotional, psychological and medical condition. Such a change would destroy them. Respondent has shown neglect toward these children. He has no healthy and safe physical environment to offer them. Throughout the lives of these children, Respondent engaged in criminal activity and in such use of alcohol or controlled substances as may render Respondent consistently unable to care for the children in a safe and stable manner. And has not paid child support, when he could, consistent with the child support guidelines promulgated by the Department of Human Services pursuant to T.C.A. 36-5-101.

* * *

3. The Department of Children's Services has made reasonable efforts toward achieving permanency for these children.

4. The children are entitled to a safe, secure and loving home. They have made significant progress since entering foster care. They are stable and thriving. Their teachers are amazed at how well they have done in school. Holly endured surgery to remove and repair teeth and is looking forward to having her adult teeth come in so she can eat corn-on-the-cob. She no longer cries herself to sleep or depends on mashed potatoes because her teeth hurt. The girls have friends. They have the opportunity to achieve permanency through adoption and are eager for that to happen. They have a home. They deserve to know where they will lay their heads at night. They should not have to rely on somebody who is unreliable, to depend on somebody who is undependable. This Court understands that Respondent now wants to be the father he has not been, but there is no doctrine requiring the Court to wait on the possibility of parole. Once released,

8

Respondent will have to reside in a half-way house, where his children cannot be with him, and he will still be a long way from establishing a suitable home for these children. The court is not willing to wait; these children have waited long enough. They have no relationship with their father to preserve.

Father does not point to evidence that preponderates against the court's findings of fact; rather, he contends that DCS did not make reasonable efforts to work with him in order to give him an opportunity to parent his children and that the case "proceeded at lightspeed." The record belies Father's argument.

DCS has been involved in some manner in the lives of Hailey and Holly all of their lives. Ms. Leslie Milligan, case manager for Hailey and Holly, introduced DCS's case summary, which showed that the first contact with the family was in October 2008, one month after Hailey's birth, when DCS got a referral from the hospital raising concerns about Hailey's care; no immediate harm factors were identified on this occasion and the situation was to be monitored by the caseworker. At another visit on November 25, 2008, no specific concerns were identified but the caseworker explained to Hailey's mother that the caseworker needed to hold a Family Service Team meeting with the family; on this occasion Hailey's mother signed a non-custodial permanency plan. On February 13, 2009, DCS visited the home after receiving a report of environmental neglect, specifically that there was no heat, water or electricity; inasmuch as Hailey's mother had made arrangements to relocate to a friend's home until she could find a home of her own, the case was closed. On April 7, 2009, a DCS caseworker made a home visit with reference to concerns regarding the stability of Hailey's mother's housing as well as "allegations of drug exposed child and environmental neglect"; DCS determined that Hailey's mother was living in a group home and that she "has all the resources needed for housing and a job." The next entry in the case summary is a visit on September 17, 2009, to Father's mother's home, where Hailey, her mother, and Father also lived, prompted by an allegation of "drug exposed child, environmental neglect"; following a visit with the family, the caseworker had no concerns and planned a follow up visit at a later date. The next entry was on October 29, 2015, after the children entered into DCS custody, for the development of a permanency plan; both parents were incarcerated at this time. The final entry was the notes from the February 17, 2016 family service team meeting. The record documents DCS' substantial involvement prior to the initiation of the dependent and neglect proceeding and during the termination of parental rights proceeding.

The record also reflects Father's criminal behavior throughout the children's lives. Father has been in and out of jail since 2003. When he has not been incarcerated since 2011 he has not visited, contacted, or supported the children; they have never had a relationship with him. In their present circumstance, the children have happy, healthy lives with a foster family in a safe and stable home. There is clear and convincing

9

evidence to support the holding that termination of Father's rights is in the best interest of the children.

## III. CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
RICHARD H. DINKINS, JUDGE

10